**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Wayne R. Urso</u>

     v.                                 Civil No. 06-cv-346-JM
                                        Opinion No.: 2008 DNH 004
<u>Prudential Insurance
Company of America</u>

## **O R D E R**

In this action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, <u>et</u> <u>seq</u>. (1999) ("ERISA"), plaintiff Wayne Urso ("Urso") seeks to enforce payment of long-term disability benefits allegedly due under an employee welfare plan insured by defendant Prudential Insurance Company of America ("Prudential").  <u>See</u> 29 U.S.C. § 1132(a)(1)(B).  Prudential objects, claiming Urso has received all the benefits to which he is entitled.  Before the court are both plaintiff's and defendant's Motions for Judgment on the Administrative Record (document nos. 15 and 17, respectively).  For the reasons set forth below, I find that plaintiff is disabled and, therefore, reverse defendant's decision to deny him long-term disability benefits.

Background[1]

## 1.  Procedural History

Plaintiff's journey to this juncture has been a long one.
He began pursuing his claim for long-term disability ("LTD")
benefits in January 2000.  At that time he worked as a computer
software engineer with Comsys Information Technology Services,
Inc. ("Comsys"), in Londonderry, New Hampshire, but stopped
working because of chest, neck and arm pains that were diagnosed
as thoracic outlet syndrome, pronater teres syndrome and carpal
tunnel syndrome.[2]  Plaintiff initially received disability

---

[1]The administrative record is Bates-stamped with the prefix
"WU," presumably for the claimant, Wayne Urso.  All references to
the administrative record simply cite the Bates-numbered pages.

[2]"Thoracic outlet syndrome" occurs in the thorax region of
the body and refers to "compression of the nerves and blood
vessels to the arms, commonly caused by motor vehicle accident or
extensive computer use." http://www.tosmri.com/.  Pronator teres
syndrome" refers to pain in the wrist and forearm associated with
the pronator teres muscle, which serves to turn the forearm so
the palm faces downward and is innervated by the median nerve.
See http://en.wikipedia.org.wiki/Pronator_teres-muscle.   "Carpal
tunnel syndrome" refers to a condition involving the carpal bones
of the hand and "occurs when the median nerve becomes pinched due
to swelling of the nerve or tendons or both.  The median nerve
provides sensation to the palm side of the thumb, index, middle
fingers, as well as the inside half of the ring finger and muscle
power to the thumb.  When this nerve becomes pinched, numbness,
tingling and sometimes pain of the affected fingers and hand may
occur and radiate into the forearm." http://www.webmed.com/pain-
management/carpal-tunnel/carpal-tunnel-syndrome.

benefits under the employee welfare benefits plan at issue in this litigation (the "Plan").  In February 2002, however, defendant determined plaintiff was no longer eligible for benefits, because he could be "gainfully occupied" within the meaning of the Plan, which disqualified him from receiving benefits.  Plaintiff challenged that decision, but on March 25, 2002, defendant notified plaintiff it would uphold its determination.  Defendant ceased making payments effective April 17, 2002.

Plaintiff then retained counsel to pursue his claim for benefits.  A second administrative appeal was filed on July 12, 2002, and also was denied, on October 29, 2002.  Defendant again explained its position that neither plaintiff's physical limitations nor his depression prevented him from performing the duties of the occupations it had identified.  WU0105b.

Rather than file a third and final appeal, on January 23, 2003, plaintiff commenced an action under ERISA to enforce the provisions of the Plan allegedly entitling him to benefits.  See Urso v. Prudential Ins. Co. of Am., Civ. No. 03-024-JD (D.N.H.) ("Urso I").  Though plaintiff had not obtained a final decision from the Appeals Committee, the court found defendant's failure

to timely review plaintiff's appeal rendered the October 29, 2002, decision the "final decision" for purposes of exhaustion. See <u>Urso I</u>, slip op. at 4 (D.N.H. Nov. 23, 2004) (citing 29 C.F.R. § 2506.503-1(i)(3)).  The court remanded the case back to the Plan administrator, because it concluded plaintiff had been denied a full and fair hearing of all the relevant evidence.  <u>See id.</u> at 12-13.

On remand, defendant evaluated all of plaintiff's medical records, including his workers' compensation file from the Massachusetts Department of Industrial Accidents, and issued its final decision on July 1, 2005.  WU0108A-F.  Defendant determined that plaintiff had been entitled to benefits for his depression and somatoform disorder[3] for the full 24 month period that the Plan provides for its subscribers with mental disabilities, and awarded him the remainder of those benefits due.  WU0108E.

---

[3]"Somatoform disorder" is "any of a group of disorders characterized by physical symptoms representing specific disorders for which there is no organic basis or known physiological cause, but for which there is presumed to be a psychological basis."  http://dictionary.reference.com/browse/somatoform%20disorder.  The physical symptoms may include "pain, nausea, depression, dizziness.. . . The complaints are serious enough to cause significant emotional distress and impairment of social and/or occupational functioning.. . . A diagnosis of somatoform disorder implies that psychological factors are a large contributor to the symptom's onset, severity and duration." http://en.wikipedia.org/wiki/Somatoform_disorder.

Defendant concluded again, however, that plaintiff had been properly denied further payments for physical disability benefits on April 17, 2002.  WU0108E; WU0198A-F.  In response, plaintiff filed the instant action, challenging the decision to deny him LTD benefits for his physical ailments.

### 2.  Factual History

Plaintiff lived in Derry, New Hampshire, when he worked as a computer software engineer with Comsys.  He worked as a project-based consultant, principally with the Massachusetts Institute of Technology.  WU0154; WU0187ZG.  Plaintiff's work brought him to various project sites, which often required him to work on computers in unusual locations, such as overhead spaces in bunkers or airplanes.  WU0187EL.  In 1997, he began experiencing the physical problems which eventually led to his stopping work on January 18, 2000.  Pl.'s Mot. Ex. 1 (Aff. of Wayne Urso, "Urso Aff."), ¶ 10.  Plaintiff complained of strain injuries from the repetitive typing in awkward positions, that were diagnosed as thoracic outlet syndrome, pronater teres syndrome and carpal tunnel syndrome.  WU00042-43.  At the time he stopped working, his annual salary was in excess of $109,000.  Urso Aff. ¶ 8.  He filed for disability benefits under the Plan on January 26, 2000, and, after completing the 90 day elimination period, was awarded

them effective April 17, 2000.  WU0048-50; WU0082.

Since July 1999, plaintiff has been treated by Dr. William
B. Patterson, who is board certified in both Internal Medicine
and Occupational and Environmental Medicine, and was chairman of
the Medical Policy Board of Occupational Health and
Rehabilitation.  WU0085-86; WU0197EL-EN.  While under Dr.
Patterson's care, plaintiff was referred to various specialists.
WU0109-11; WU0187EJ-FN.  In January and March of 2000, plaintiff
had surgery for the carpal tunnel and pronator teres syndromes.
WU0126-27; WU0132-33.  Although he did physical and occupational
therapy after his surgeries, he did not recover as expected.  On
June 19, 2000, Dr. Patterson determined that plaintiff had
reached a medical endpoint, because his condition was improved as
much as it was going to improve.  At that time, the pronator
teres syndrome was resolved, but plaintiff continued to suffer
from mild thoracic outlet syndrome and residual carpal tunnel
syndrome.  WU0187ZI.  Dr. Patterson recommended restricted work
conditions, which could not be accommodated in plaintiff's prior
position with Comsys.[4]  Plaintiff did not return to work, either

---

[4]Dr. Patterson specifically found:  "he will need permanent
mild restrictions with respect to prolonged computer use and
repeated activities at and above shoulder levels or in awkward
positions."  WU0144

at Comsys or elsewhere.

In March 2001, Dr. Stefanos Kales examined plaintiff as part of his workers' compensation claim. WU0187ZG-ZL. Plaintiff complained of pain and numbness in both hands, with increased numbness in his fingers from overhead activities, soreness and stiffness in his neck, and disturbed sleep. WU0187ZI. Plaintiff reported that he walked almost daily, performed light housework and was completely independent in all mundane activities. Dr. Kales examined plaintiff and confirmed that he had mild paresthesia[5] bilaterally, although his left side was weaker and more numb than his right side. He concluded that plaintiff had a partial disability of a permanent nature and that he had reached a "maximal medical improvement" endpoint. WU0187ZK. Dr. Kales restricted plaintiff to driving no more than 45 minutes at a time, doing computer work only 1-3 hours per day, and changing positions frequently. Id. Consistent with previous diagnoses, Dr. Kales opined that plaintiff's medical problems were likely caused by the awkward, overhead positions in which he had frequently worked, and which had caused nerve entrapment

_____

[5]Paresthesia is "a skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause." http://dictionary.reference.com/search.

syndromes of the upper extremities.  WU0187ZK.  Plaintiff settled
his workers' compensation claim on October 19, 2001.  WU0187EF-
EG; WU0187GK & WU0187RL-RP.

Sometime in the summer of 2001, plaintiff decided to
relocate to his vacation home in Errol, New Hampshire, and to
sell his primary residence in Derry, New Hampshire, to reduce his
living expenses and offset some of the financial difficulties
caused by his job loss.  WU0079; WU0145.  Also in the summer of
2001, plaintiff began experiencing symptoms of depression, which
Dr. Patterson diagnosed on September 17, 2001.  WU0071.  In Dr.
Patterson's opinion, plaintiff's medical problems and the
resulting loss of his job, income and lifestyle changes causally
contributed to the depression.  Id.  While plaintiff was not
cognitively impaired by the depression, it did impact his
functional ability, affecting his moods and disturbing his sleep.
He was prescribed antidepressants to treat it.  WU0149-51.

In November 2001, plaintiff began treatment at the Northern
New Hampshire Mental Health Center, with a nurse practitioner,
Kathy Patch.  WU0156-68.  Ms. Patch confirmed Dr. Patterson's
assessment that plaintiff suffered from depression and anxiety,
and determined he also had adjustment disorder.  She treated
plaintiff for "dysphoric mood secondary to medical and financial

8

problems." WU0083.

In February 2002, plaintiff notified defendant that he had worked with vocational rehabilitation counselors, and was currently working with a state employment agency to find meaningful work he could perform, given his limitations. WU0080. Although plaintiff had not yet succeeded in finding a job, he invited any assistance defendant could provide in that endeavor. Id.

Shortly thereafter, on February 26, 2002, defendant notified plaintiff that it had determined he was no longer disabled within the meaning of the Plan, and that his disability benefits would end as of April 17, 2002. Under the Plan, plaintiff had been disabled in January 2000, because he was:

> unable to perform the material and substantial
> duties of [his] regular occupation due to [his]
> sickness or injury, and [he had] a 20% or more
> loss in [his] indexed monthly earnings due to that
> sickness or injury.

WU0081. After 24 months, however, plaintiff would have continued to receive payments, in the form of LTD benefits, only if defendant determined that:

> due to the same sickness or injury, [he was]
> unable to perform the duties of any gainful
> occupation for which [he was] reasonably fitted
> by education, training or experience.

Id.  Defendant concluded there was no medical evidence of an impairment that would prevent plaintiff from being "gainfully occupied," because any one of the following five identified positions could accommodate plaintiff's work restrictions and physical limitations:

1) logistics engineer, estimated wage of $31.20/hour,
2) consultant, estimated wage of $45.15/hour,
3) data base administrator, estimated wage of $35.72/hour,
4) data base analyst, estimated wage of $32.80/hour,
5) information scientist, estimated wage of $31.80/hour.

WU0082.  These jobs were located in the Manchester, New Hampshire, labor market.  At that time, however, plaintiff lived in Errol, New Hampshire, approximately 170 miles and a three hour drive north of Manchester.  Defendant explained its finding by stating that "[a]lthough you currently live in northern New Hampshire, it is reasonable to assume that you would have maintained employment with your original employer had you remained in that local labor market."  Id.

Defendant also determined that plaintiff's depression was not so disabling to warrant continued benefits, because he did not have any "cognitive impairments, there were no persistent disabling symptoms of depression, there was no evidence of a disabling anxiety component.  Your psychiatric condition in and of itself did not support a criteria for Total Disability as

10

defined by the policy." WU0083. Defendant concluded plaintiff
would benefit from therapy to improve his coping skills, but his
mental condition did not preclude him from becoming gainfully
employed. Id.

Plaintiff challenged the decision and provided medical
support for his claimed disability. Although plaintiff conceded
that his education and training enabled him to do the identified
jobs, he contended his limited keyboarding ability would preclude
him from actually being able to perform those jobs. WU0087b.
Dr. Patterson examined plaintiff on March 21, 2002, and found he
still suffered from mild tingling and pain in the upper arms,
with mild stiffness in the neck and diminished sensations, but
that he had full neck range of motion. As part of that
examination, Dr. Patterson also documented that plaintiff
continued to be moderately depressed. Dr. Patterson disputed
defendant's position that plaintiff's symptoms were "primarily .
. . self reported," and concluded plaintiff was still disabled
from gainful computer work due to severe, chronic thoracic outlet
syndrome and moderately severe depression. WU0085-86; WU0187KG-
KH. Despite that report, on March 25, 2002, defendant affirmed
its conclusion that plaintiff was not disabled and ceased
benefits payments effective April 17, 2002. WU0087a.

11

Separate from his claim for LTD benefits from defendant, plaintiff was pursuing a claim for benefits from the Social Security Administration.  As part of that process, on April 5, 2002, the Social Security Administration had plaintiff evaluated by a psychologist, Dr. Laurie Brodeur.  WU0093.  She classified plaintiff as suffering from major depression.  Id.  Plaintiff's claim for Social Security disability benefits was approved in July 2002.  WU0231.

Sometime in 2002, plaintiff began seeing Dr. Alan Kaplan, a cardiologist, who diagnosed plaintiff with coronary artery disease, hypertension, hyperlipidemia, and diabetes.  Plaintiff was treated with medications, diet and exercise.  WU0108C. During this period, plaintiff appears to have been referred to Dr. Lisa Gagne to treat his diabetes.  WU0187DN-DX.

In January 2003, as part of plaintiff's continued Social Security disability benefits, he was evaluated by Dr. Ernest Desjardins, a Neuropsychologist with the Massachusetts Department of Industrial Accidents, who prepared an extensive report. WU0187RA-RK.  Dr. Desjardins diagnosed plaintiff with "cognitive, motor, and sensory asymmetries and deficits" that were "consistent with moderate to severe bilateral cerebral dysfunction."  WU0187RI.  Dr. Desjardins concluded that

12

plaintiff's medical problems were related to a combination of his "repetitive motion injuries, the severe treatment-resistant major depression, and the severe somatoform or pain disorder." Id. Dr. Desjardins recommended plaintiff seek more effective treatment for his depression, including therapy.  He also recommended plaintiff renew his efforts for LTD benefits. WU0187RK.

Throughout 2003, plaintiff's physical health did not improve.  On May 19, 2003, plaintiff was examined by Dr. Kaplan and reported that he felt well, without any chest pressure or shortness of breath, yet Dr. Kaplan found he also had increased hypertensive retinopathy[6] and elevated blood pressure.  WU0187BD- BE.  Again Dr. Kaplan prescribed a combination of dietary changes and medication.  In July 2003, Dr. Patterson examined plaintiff, who reported that he had been "relatively stable" since his last visit in 2002.  WU0187KG-KH.  Although plaintiff had lost weight, Dr. Patterson encouraged him to exercise more, as a means of alleviating his physical and mental symptoms.  Dr. Patterson concluded that, based on his "familiarity with [plaintiff's]

_____

[6]"Hypertensive retinopathy is damage to the retina due to high blood pressure (i.e. hypertension)." http://en.wikipedia.org/wiki/Hypertensive_retinopathy.

condition" and his review of the neuropsychological testing, plaintiff remained "completely disabled from gainful computer work." WU0187KH.

In January 2004, plaintiff returned to Dr. Kaplan for a routine evaluation and was found to be stable, although he had gained weight which caused his lipid levels and his plaquing to increase. WU0187BB. Dr. Kaplan again prescribed diet and exercise to treat plaintiff's condition. By late spring, plaintiff began experiencing chest pains, but which resolved with rest. On August 3, 2004, plaintiff had a cardiac catheterization procedure that involved placement of a stent. WU0187BW-CA. The stent placement further restricted plaintiff, by limiting his ability to climb stairs and lift more than 20 pounds. WU0187CE, CW-CX. Following the procedure, plaintiff's musculoskeletal complaints and neurological symptoms were reduced, including his neck stiffness and chest and abdominal pain. WU0187AZ.

Plaintiff, still experiencing health problems, went to see Dr. Raymond Psonak, an Environmental Medicine specialist, in January 2005. WU0187MG-MC. Dr. Psonak found that plaintiff had heavy metal toxicity, which may have contributed to his health deterioration and which would require chelation treatments to alleviate the adverse health effects. WU0108C; WU0187MC. Dr.

14

Psonak opined that plaintiff's ability to work would be impaired until the effects were reversed.  Id.

On March 21, 2005, Dr. Patterson again examined plaintiff and found him in essentially the same condition as he had been when last seen in July 2003, but with several medical problems not related to his work injuries.  WU0187EF-EG.  Plaintiff complained to Dr. Patterson of persistent symptoms from his work injury.  Dr. Patterson's examination found:  bilateral tingling in both hands within 15 seconds of elevation; tingling and pain in both forearms; and diminished sensation in the median nerve bilaterally; but also that plaintiff had full range of neck and shoulder motion, normal elbows, intact reflexes in the upper extremities, and very good muscle strength bilaterally. WU0187EF.  Dr. Patterson noted plaintiff reported his depression continued and that plaintiff attributed the depression to his life status change, physical limitations, pain, and disputes over disability coverage.  Dr. Patterson again reconfirmed his diagnosis of moderately severe, bilateral thoracic outlet syndrome, bilateral carpal tunnel syndrome and depression, and concluded plaintiff was still "substantially impaired and unable to return to his former work" with computers.  WU0187EG-EH.

In June 2005, on remand following Urso I, defendant reviewed

15

plaintiff's medical file and conducted direct observations of him, but did not perform another physical examination.  An independent physician specializing in Occupational Medicine, Internal Medicine and Pulmonary Diseases, Dr. Clayton Cowl, evaluated plaintiff's medical records, including his workers' compensation file.  WU0108C; WU0187S-V.  Dr. Cowl agreed with Dr. Patterson's findings that plaintiff continued to have tingling in the hands that was aggravated by shoulder extension, and to have diminished sensation in the median nerve bilaterally, but that he also had normal reflexes and very good muscle strength.  <u>Id.</u>  Dr. Cowl also agreed that plaintiff's cardiac problems would restrict his ability to lift more than twenty pounds or climb more than two flights of stairs.  <u>Id.</u>

Dr. Cowl disagreed, however, that these medical limitations precluded plaintiff from being gainfully occupied within the meaning of the Plan and rejected Dr. Patterson's opinion about plaintiff's incapacity to work.  Dr. Cowl also questioned plaintiff's metal toxicity and found it would not adversely impact his work capacity.  Based on his review of plaintiff's entire medical file, Dr. Cowl concluded that plaintiff could perform sedentary to light work with the noted restrictions, including limited keyboarding, restricted grasping, pinching or

16

overhead movements, and limited twisting of the wrists.
Defendant, therefore, reaffirmed its previous finding that
plaintiff could perform any of the five occupations identified in
February 2002.  WU0108E; WU0302AB–AK.

Defendant also reviewed plaintiff's mental health records,
including the workers' compensation and Social Security
Administration claim files.  Based on those records, defendant
reversed its prior decision about plaintiff's mental disability
and determined that he had suffered from mental disabilities
within the meaning of the Plan.  Under the Plan however, mental
disability benefits have a lifetime limit of 24 months.
Accordingly, plaintiff was awarded benefits for the 17 month
period from April 17, 2002, the date defendant had stopped making
payments, through September 16, 2003, the date through which
plaintiff was entitled to have received them.  WU0108E.

Finally, defendant observed plaintiff in the ordinary course
of his life, on May 25, 26, 27 and 28, 2005.  WU0187A–Q.
Defendant found that plaintiff was active in the Kiwanis Club in
Colebrook, New Hampshire, about a 30 minute drive from his home
in Errol.  Defendant found that plaintiff was the president–elect
of the Kiwanis club, was the chairman of both the club's website
committee and the public information committee, and was a member

17

of the scholarship committee and the finance committee.  <u>See</u>
WU0108E; WU0187I.  Plaintiff also audited the club's books.  In
addition to this work for the Kiwanis Club, plaintiff developed
and maintained a website for a local sporting goods store in
Colebrook, and had worked on a commission basis from his home.
WU0187K.  Based on these observations, defendant concluded that
plaintiff could be self-employed, in addition to being able to
perform the previously identified jobs.

Discussion

**A.  Standard of Review**

In an ERISA case where a claimant seeks review of the
administrative record, as plaintiff does here, summary judgment
is the vehicle used to decide the issue of entitlement to
benefits.  <u>See</u> <u>Bard v. Boston Shipping Ass'n</u>, 471 F.3d 229, 235
(1st Cir. 2006) (using summary judgment to decide eligibility for
benefits based on the administrative record); <u>see</u> <u>also</u> <u>Orndorf v.</u>
<u>Paul Revere Life Ins. Co.</u>, 404 F.3d 510, 517 (1st Cir. 2005)
(explaining limited role of summary judgment where administrative
record is reviewed to determine benefits eligibility).  The usual
summary judgment analysis, of reviewing the record to ensure
there are no disputed issues of material fact and construing all
reasonable inferences in favor of the objecting party, <u>see</u>

18

Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001)
(citing authority), does not apply in an ERISA action challenging
a decision to deny benefits.  See DiGregorio v. Hartford
Comprehensive Employee Benefit Serv. Co., 423 F.3d 6, 12 (1st
Cir. 2005) (discussing how cross motions for summary judgment on
the administrative record permits the court to make factual
findings instead of granting inferences to each non-movant);
Orndorf, 404 F.3d at 517 (explaining "the non-movant is not
entitled to the usual inferences in his favor").

     Because the focus of the court's review is the final
administrative decision, "the district court sits more like an
appellate tribunal than a trial court."  Leahy v. Raytheon Co.,
315 F.3d 11, 18 (1st Cir. 2002); see also Orndorf, 404 F.3d at
519 (finding the exhaustion and finality requirements of ERISA
focus the review on the administrative decision and preclude
consideration of new substantive evidence); Liston v. UNUM Corp.
Officer Severance Plan, 330 F.3d 19, 24 and n.4 (1st Cir. 2003)
(declining to allow jury trials to resolve ERISA benefits claim).
"Where review is properly confined to the administrative record
before the ERISA plan administrator, . . . there are no disputed
issues of fact for the court to resolve," Orndorf, 404 F.3d at
518, and summary judgment must be based on the record before the

court.  See id. at 517–18 (holding that no new evidence may be considered in challenges to the merits of the benefits decision regardless of the deference given to the plan administrator). The analysis is the same for cross motions for summary judgment. See id. at 513.

The final administrative decision to be reviewed is defendant's July 1, 2005 denial of benefits ("final decision"). "'A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Orndorf, 404 F.3d at 517 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  Defendant concedes that its final decision is subject to de novo review, because defendant is collaterally estopped from relitigating this issue.  See Urso I, slip op. at 7 (concluding policy did not give defendant discretionary authority); see also Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86, 89 (1st Cir. 2007) (explaining issue preclusion).  Under a de novo review, the court interprets the terms of a policy like it would any other contract terms, looking to the plain language and other manifestations of the parties' intent.  See Firestone Tire & Rubber Co., 489 U.S.

20

at 112 (describing de novo standard of review); see also
Balestracci v. NSTAR Elec. & Gas Corp., 449 F.3d 224, 230 (1st
Cir. 2006) (interpreting ERISA benefit plan under federal
substantive law, based on principles of contract interpretation
and the law of trusts).  De novo review requires the court to
determine whether or not the administrative decision was correct
and "'allows the court to substitute its judgment for that of the
plan administrator.'"  Marquez-Massas v. Squibb Mfg., Inc., 344
F. Supp. 2d 315, 321 (D.P.R. 2004) (quoting Kathryn J. Kennedy,
Judicial Standard of Review in ERISA Benefit Claim Cases, 50 Am.
U. L. Rev. 1083, 1084 (2001)).

        The court, therefore, is required to independently evaluate
the facts and opinions in the administrative record, in order to
assess whether or not plaintiff has met his burden of proving
that he is disabled within the meaning of the policy.  See
Orndorf, 404 F.3d at 518.  "One guiding principle in conducting
de novo review of this ultimate conclusion is that it is the
plaintiff who bears the burden of proving he is disabled."  Id.
at 518-19; see also Terry v. Bayer Corp., 145 F.3d 28, 34 (1st
Cir. 1998) (requiring the insured show the ERISA violation).  To
prove defendant's decision to deny him LTD benefits was
incorrect,   plaintiff must show how the evidence demonstrates

that his work restrictions and driving limitations render him
disabled within the meaning of the Plan.  With this standard in
mind, I turn now to the administrative record.

**B.  Evidence of Plaintiff's Disability**

Plaintiff makes three arguments in support of his claim for
LTD benefits.  First, he claims the medical evidence demonstrates
that he is, in fact, disabled.  He argues defendant failed to
consider all the evidence the court ordered it to consider on
remand from <u>Urso I</u>, in particular his worker's compensation file,
and failed to conduct an independent medical evaluation of him.
Second, he contends defendant's determination that he could be
gainfully employed relies on jobs that are not available in the
labor market where he lives or which he can access.  And finally,
plaintiff asserts that his mental disabilities are a symptom of
his physical injuries and, therefore, should not be subject to
the 24 month limit on benefits payments for mental health-related
disabilities.  I address each argument below.

<u>1.  Medical Evidence of Plaintiff's Disability</u>

Plaintiff contends the July 1, 2005 denial of LTD benefits
should be reversed because defendant failed to consider his
worker's compensation file and failed to conduct a current,
independent physical examination of him.  What evidence defendant

22

considered, however, is immaterial to my analysis here, because
no deference is given to the plan administrator's decision in
conducting a de novo review.  See Firestone Tire & Rubber Co.,
489 U.S. at 111–15 (explaining de novo standard of review for
ERISA denials); see also Marquez–Massas, 344 F. Supp. 2d at 321
(substituting court's judgment for the plan administrator's in de
novo review).  "Rather, de novo review generally consists of the
court's independent weighing of the facts and opinions in [the]
record to determine whether the claimant has met his burden of
showing he is disabled within the meaning of the policy.  While
the court does not ignore facts in the record, the court grants
no deference to administrators' opinions or conclusions based on
these facts." Orndorf, 404 F.3d at 518 (citing Recupero v. New
Eng. Tel. & Tel. Co., 118 F.3d 820, 830 (1st Cir. 1997).
Accordingly, plaintiff's argument that defendant failed to review
the worker's compensation file or conduct an independent medical
examination of him is unpersuasive and irrelevant to my analysis
of whether or not the denial of benefits was correct.

A reversal is warranted only if plaintiff proves defendant's
denial was incorrect, because the record demonstrates he is, in
fact, disabled within the meaning of the Plan.  Since plaintiff
bears the burden of demonstrating he is disabled, see Orndorf,

404 F.3d at 519, it was plaintiff's burden to ensure the medical
evidence he deemed relevant was in the administrative record.
Defendant's independent medical expert, Dr. Cowl, concluded that
plaintiff had physical limitations and work restrictions
consistent with and based on the opinions of the various doctors
who had treated plaintiff since the onset of his disability in
2000.[7]  Since Dr. Cowl agreed with the diagnoses of plaintiff's
problems, defendant was not obliged to obtain independent medical
evidence.  See Brigham v. Sun Life, 317 F.3d 72, 85 (1st Cir.
2003) (accepting claimant's diagnoses and limitations excuses
insurer from obtaining its own medical evidence).  Moreover, it
is also clear from the record that defendant, in fact, reviewed
plaintiff's worker's compensation file.  See WU0187T (listing the
files Dr. Cowl reviewed to issue his report).  The administrative
record, therefore, in fact contains the evidence plaintiff now
argues is necessary for his showing of disability.

　　　After conducting a de novo review of the record, I find that

---

[7]In response to defendant's request for a comment on the
current diagnoses, Dr. Cowl stated:  "The current diagnoses
provided include bilateral carpal tunnel syndrome, status post
sequential median nerve releases in January and March 2000;
hypertension; hyperlipidemia with coronary artery disease;
dysphoria/depression and status post pronator teres release.
These diagnoses are supported by the medical data submitted for
review."  WU0187U (emphasis added).

plaintiff continues to suffer from physical injuries that impair his ability to work.  The consistent opinions of Dr. Patterson from 1999 through 2005, Dr. Kales, Dr. Kaplan and Dr. DesJardins, which Dr. Cowl adopted, support the conclusion that plaintiff began suffering from the bilateral carpal tunnel, pronator teres and thoracic outlet syndromes in 1997 because of the repetitive strain injuries his work with Comsys caused.  Despite two surgeries and postoperative occupational and physical therapy, plaintiff never fully regained his pre-injury status.  From April 2002, when his short-term disability benefits ended, until March 2005, when he was last examined by a doctor, plaintiff's condition remained fairly stable with respect to his work-related injuries, and worsened because of the heart and mental health problems he developed during that period.  The administrative record, therefore, contains ample medical evidence demonstrating that plaintiff has health problems stemming from "the same sickness or injury," WU0081, that continue to impact his ability to return to work.

The undisputed evidence, as set out above, consistently demonstrates that plaintiff continues to suffer from the following medical problems:  (1) bilateral carpal tunnel syndrome and bilateral thoracic outlet syndrome; (2) persistent numbness,

tingling and diminished nerve sensations in the upper
extremities, extending into the neck, which are aggravated by
overhead extension, although his reflexes and muscle strength are
both good; (3) hypertension and high blood pressure, for which he
has been prescribed medication and advised to make changes to his
diet and exercise routine; and (4) depression.

### 2.   Ability to be Gainfully Occupied

The critical issue for purposes of plaintiff's LTD benefits
claim, however, is not simply whether there is medical evidence
of plaintiff's physical impairments, but whether those specific
injuries prevent him from being "gainfully occupied" as defined
by the Plan.  The Plan defines "disabled" to include both a
medical and an economic component.  After 24 months of receiving
disability benefits, the Plan provides for payments to continue
as LTD benefits if defendant "determines that due to the same
sickness or injury, [the claimant is] unable to perform the
duties of any **gainful occupation** for which [the claimant is]
reasonably fitted by education, training or experience."   WU0021
(emphasis in original).  The Plan defines "Gainful occupation"
as:

> an occupation, including self-employment,
> that is or can be expected to provide you
> with an income equal to at least 60% of

26

> your indexed monthly earnings within 12
> months of your return to work.

Id. Together these provisions state that LTD benefits may be
awarded only if plaintiff's same injuries prevented him from
obtaining work which would have enabled him to earn 60% of his
former salary within the first year of returning to work.  Since
the plain language of the Plan requires defendant to determine
whether or not plaintiff can be gainfully occupied, the Plan
necessarily must also require that defendant identify a gainful
occupation available to plaintiff.  See id.; see also Firestone
Tire & Rubber Co., 489 U.S. at 112 (construing plan provisions
according to their plain language); Balestracci, 449 F.3d at 230
(same).

        The factors to be considered when determining whether a
claimant could be gainfully occupied include his "abilities,
skills and education, as well as an assessment of the labor
market in the claimant's geographic region." Caldwell v. Life
Ins. Co. of N.Am., 287 F.3d 1276, 1289 (10th Cir. 2002).  After
carefully reviewing the complete record, I agree with defendant's
conclusion that plaintiff was capable of performing work at a
sedentary to light level of duty, despite his having reached a
medical endpoint of a permanent, partial disability and Dr.

Patterson's consistent opinion that plaintiff could not return to his former work with computers.  See e.g. WU0187V (Dr. Cowl's opinion); see also Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) (treating physicians opinions are not given controlling weight in ERISA cases).  The record specifically demonstrates that plaintiff has advanced computer knowledge, which has been applied to multiple tasks in a variety of situations, including writing complex software, consulting, and trouble-shooting computer problems.  See e.g. WU0187KY-LE (assessing plaintiff's professional background).  Plaintiff retained these skills despite his work-related injuries, which explains the consistent medical conclusion that plaintiff's physical impairments limit his job options but do not render him completely unable to work.

My agreement with defendant's assessment of plaintiff's ability to be gainfully occupied, however, ends here.  Although I find plaintiff was able to resume some level of light duty to sedentary work within the computer industry, there is no evidence of any jobs which plaintiff could reasonably have been expected to do, given his physical impairments.  The record clearly and consistently shows that plaintiff's physical injuries restricted him to driving no more than one hour at a time, keyboarding no

more than three hours at a time, climbing no more than two
flights of stairs and lifting no more than 20 pounds over his
head.  See e.g. WU0187S-V (Dr. Cowl's report on plaintiff's
medical problems and resulting physical limitations).  Given
these limitations, under the Plan, for defendant to deny LTD
benefits here, it had to identify jobs no farther than an hour
away from plaintiff's home that would enable him to earn 60% of
his former salary.  Defendant, however, did not do this.

Although vocational evidence of alternative jobs is not
always required, I find that the facts in this case required
defendant to provide plaintiff with a vocational assessment in a
labor market that accommodated his driving restriction.  See
Caldwell, 287 F.3d at 1289-90 (citing other circuits and
concluding the need for vocational evidence must be assessed on a
case-by-case basis); cf. Pari-Fasano v. ITT Hartford Life &
Accident Ins. Co., 230 F.3d 415, 420-21 (1st Cir. 2000) (not
requiring vocational assessment because other evidence showed
claimant had only minor restrictions); Quinn v. Blue Cross & Blue
Shiled Ass'n, 161 F.3d 472, 476 (7th Cir. 1998) (reversing denial
of benefits as arbitrary where no vocational evidence was adduced
or considered).  While I recognize that plaintiff bears the
burden of proving he is disabled within the Plan, when, as is the

29

case here, plaintiff specifically argues his physical limitations prevented him from performing the jobs defendant identified, defendant should have considered that limitation when analyzing his ability to be gainfully occupied.  See Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 773-74 (10th Cir. 2004) (explaining that defendant has a fiduciary duty to make a reasonable inquiry into evidence that might support claimant's theory of entitlement). "While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them." Id. at 774.

The record demonstrates that defendant attempted to garner the necessary evidence to support its determination that plaintiff was able to perform other occupations.  As defendant explained:

> In order to assist Mr. Urso in returning to work
> we referred his claim for Vocational Rehabilitation
> assistance.  A number of occupations were identified
> and were within the restrictions and limitations
> provided by Dr. Patterson.  Therefore, his claim
> was terminated as there was no impairment on file
> which would have prevented him from performing
> another occupation.

WU0108N (October 29, 2002 denial letter to plaintiff).  The identified occupations, however, were all located in the Manchester labor market, a prohibitively distant commute for

plaintiff, who lived more 175 miles north in Errol.  Nothing in
the record indicates that defendant reevaluated the labor market
in 2005, when it issued its final denial.  Despite the undisputed
evidence that plaintiff could not drive more than an hour because
of the pain and numbness holding the steering wheel caused,
defendant determined that plaintiff could perform jobs a three
hour drive from his home.  This conclusion is wholly undermined
by the evidence of plaintiff's physical limitations.  See e.g.
WU0187EL-EN (June 2000 opinion letter explaining plaintiff's
upper extremity ailments were aggravated by his 3-4 hour
commuting distance or any prolonged driving); WU0082 (discussing
September 2001 finding that plaintiff could not drive); WU0187ZI
(Dr. Kales' determination that plaintiff could not drive more
than 30-45 minutes); WU0172 (March 2002 report that plaintiff
cannot drive more than 20 minutes before the pain in his arms
required him to stop the car to move his arms and shoulders to
relieve the aching and numbness); WU0187W-Z (Dr. Soucy's notes
from June and August 2002 documenting "neck, arm and upper body
pain with associated muscle spasms"); WU0187EF (March 2005
medical evaluation states plaintiff took eight hours to drive a
distance that should have taken three to four hours, because the
pain in his arms required him to stop to move them); WU0187U (Dr.

Cowl's finding in June 2005 that plaintiff is "limited in his ability to perform repetitive grasping and pinching, or to perform twisting motions of the wrists").

Defendant justifies its use of the Manchester labor market rather than the Errol labor market, by contending that plaintiff did not need to move, because Comsys would have hired him again. The record, however, does not support that finding.  To the contrary, the record indicates that his former position with Comsys was eliminated, and alternative positions with the company were not realistic options.  See e.g., WU0187LE-G.

Defendant also concluded plaintiff was not disabled because he could be self-employed, and could thereby satisfy the Plan's definition of being "gainfully occupied."  The record, however, contains no evidence to support this conclusion.  Although defendant relies on the volunteer work plaintiff has done with the local Kiwanis Club, there is no reasonable basis to conclude that volunteer work could be parlayed into a home-based business, or could otherwise generate an income-stream, that would enable plaintiff to earn 60% of his indexed former monthly salary, which the Plan requires in order to be a "gainful occupation."

Defendant also cites the independent contract work plaintiff has done for a local sporting goods store as support for its

conclusion that plaintiff could be self-employed.  Again,
however, the record contains no evidence of what income that work
has yielded or what plaintiff could reasonably be expected to
earn doing independent computer consulting projects, based either
on what plaintiff actually has been paid by the store in
Colebrook, or on what similar computer-based independent
contractors earn in northern New Hampshire.  Because the Plan
requires an alternative occupation to generate 60% of the
claimant's indexed monthly earnings to avoid payment of LTD
benefits, what plaintiff's earning potential would be if self-
employed is critical to the disability determination.

My review of the record indicates that plaintiff has carried
his burden of demonstrating that he cannot be gainfully occupied
and, therefore, is disabled within the meaning of the Plan.
Defendant has failed to garner the vocational evidence needed to
justify its determination that plaintiff could find an occupation
in the relevant labor market in which he could earn 60% of his
former salary.  No vocational evaluation has been done since
plaintiff's benefits were terminated in April 2002.  The jobs
identified at that time, which are the only occupations defendant
has determined plaintiff could perform, do not accommodate his
limited driving ability.  Because that restriction resulted from

33

"the same sickness or injury" that caused him to become disabled
in January 2000, and now prevents him from performing the
occupations defendant identified in the Manchester labor market,
plaintiff has shown that he is disabled within the meaning of the
Plan.  Based on the record before me, I find defendant
incorrectly denied plaintiff LTD benefits and reverse that
determination.

### 3.  LTD Benefits based on Mental Health Problems

Plaintiff's final argument in support of his claim for LTD
benefits is that his mental health problems are a symptom of the
underlying physical injuries which caused his disability.
Plaintiff has provided nothing to substantiate his claim that his
persistent depression is a symptom of carpal tunnel syndrome,
pronator teres syndrome or thoracic outlet syndrome.  Even
accepting as true plaintiff's argument that he has suffered from
depression secondary to his work-related injuries, the evidence
does not show that the depression was the injury which initially
caused plaintiff to be disabled, as is required to qualify
plaintiff for LTD benefits.  Moreover, while the depression may
be related to the work-related injuries plaintiff has suffered,
there is no evidence that it is a symptom of those same injuries.

The plain language of the Plan limited plaintiff's right to

34

disability benefits for mental health problems, such as
depression, to 24 months of payments.  It is undisputed that
plaintiff received this benefit in full.  His claim now to
continued benefits because his depression is related to his
disabling physical injuries is unavailing.  I will not grant
relief on that basis.

### Conclusion

For the reasons set forth in detail above, plaintiff's
motion for summary judgment is granted (document no. 15) and
defendant's motion for summary judgment is denied (document no.
17).  Plaintiff is entitled to an award of LTD benefits
consistent with the terms of the Plan.

If, as is the case, plaintiff prevailed, defendant requested
that a hearing be scheduled to determine the appropriate amount
of benefits due.  That request is hereby granted.  The parties
are ordered to file within ten (10) days of the date of this
order any documents they deem necessary to substantiate their
position on the amount the Plan entitles plaintiff to receive.
The clerk is ordered to schedule a hearing within thirty (30)

days of the date of this order, at which time the parties will be

heard on the appropriate amount they believe plaintiff is due.

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge


Date:    January  9, 2008

cc:      Robert A. Shaines, Esq.
         Christopher Flanagan, Esq.
         William Bogaert, Esq.

36