UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Wayne R. Urso

    v.                                             Civil No. 06-cv-346-JM

Prudential Insurance
Company of America


**O R D E R**

Plaintiff Wayne Urso successfully brought this action, pursuant to 29 U.S.C. §§ 1001, et seq. ("ERISA"), to enforce payment of long-term disability benefits due under an employee welfare benefit plan ("Plan") offered by his former employer, Comsys Information Technology Services, Inc. ("Comsys") and insured by defendant, The Prudential Insurance Company of America ("Prudential"). Before the court are two motions filed by Urso, one for damages, interest and costs (document no. 22), and one for attorney's fees (document no. 27). Prudential objects to both motions (document nos. 24 and 30, respectively). Because I found that Urso was disabled within the meaning of the Plan, he is entitled to long-term disability ("LTD") benefits. The parties dispute the amount of the benefits award, whether Urso is

entitled to prejudgment interest, and whether Urso may be reimbursed for his attorney's fees and costs.  As explained in detail below, both of Urso's motions are granted.

**1.   Motion for Damages, Interest and Costs (doc. no. 22)**

Urso claims he is entitled to receive $165,032.37 from Prudential, which represents the sum total of his damages ($152,640.26), interest thereon ($7,922.56) and the costs associated with obtaining the benefits at issue here ($4,469.55).  Urso also asserts that he is entitled to continue to receive monthly benefit payments until he reaches retirement, 156 months from now, in 2021.  Prudential disagrees with the monthly benefit amount Urso used to calculate the damages award, arguing the wrong salary figure was used.  Prudential also argues that Urso is not entitled to either interest or future benefits payments as a matter of law.  Prudential asserts that Urso's LTD benefits award must be limited to the period from April 17, 2000, when Urso first became entitled to LTD benefits, to January 31, 2008, the last day of the month in which liability was determined.

(a)   Damages Calculation

How much Urso is entitled to receive in damages is governed by the terms of the Plan.  See Balestracci v. Nstar Elec. & Gas

Corp., 449 F.3d 224, 230 (1st Cir. 2006) (applying "common sense principles of contract interpretation" to ERISA plans) (internal quotation omitted)); Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517-18 (1st Cir. 2005) (explaining de novo standard of review in ERISA cases).  The Plan provides a four-step process to calculate benefit payments if a claimant, like Urso, is both disabled and not working.  See Administrative Record WU0022 (hereinafter referred to simply by the Bates-numbered page).[1]  The first step requires a claimant's monthly earnings to be multiplied by 60%, to determine the gross amount of any potential LTD benefit payment.  The next three steps require that gross amount to be capped, and then reduced by "any deductible sources of income," which includes social security disability payments and worker's compensation payments, to arrive at the actual monthly payment.  The threshold issue in determining the benefits award, therefore, is what the "monthly earnings" are.

The Plan defines "monthly earnings" as:  "your average

---

[1] The Plan has two separate formulas for calculating LTD benefits, depending on whether the claimant is "disabled and not working" or "work[s] while . . . disabled."  See WU0022-24.  At issue here is the availability of LTD benefits for Urso when he became disabled *and stopped working*, which, according to his application for LTD benefits, occurred on January 18, 2000.  See WU0042.

months Base Pay and Commissions during the 3 month period prior to your date of disability.  It does not include income received from bonuses, overtime pay, any other extra compensation, or income received from sources other than your Employer." WU0023. Critical to this definition is the onset "date of disability," because the Plan requires the average salary for the three months before a claimant becomes disabled to be the "monthly earnings" used to determine the LTD benefits award.[2]

The parties dispute what period of time constitutes the "3 month period prior to your date of disability."  Prudential argues Urso became disabled on January 18, 2000, when he stopped working at Comsys and filed his claim for LTD benefits, so the relevant time period is October – December, 1999.  Urso argues he was already disabled in 1998 or 1999, as evidenced by his medical records and his reduced work load and salary in 1999, rendering the three months when he last worked on a full-time basis the

---

[2] The significance of the "date of disability" to ascertain both the eligibility for and the amount of benefits is manifest throughout the Plan.  For example, the "Benefit Highlights" of the Plan states:  "The long term disability plan provides financial protection for you by paying a portion of your income while you have a long period of disability.  The amount you receive is based on the amount you earned before your disability began.  In some cases, you can receive disability payments even if you work while you are disabled.  Benefits start after the elimination period." WU0013.

relevant time period.  Although the record shows that Urso first applied for LTD benefits when he stopped working on January 18, 2000, neither the date of his application nor the date he stopped working is the definitive date for purposes of calculating Urso's benefits award.  The critical date in determining a benefits award is when the participant becomes disabled, not when the claimant stops working, because the Plan provides for benefits payments regardless of whether or not a claimant is working, as long as the claimant is disabled.  See WU0023 (formula for calculating benefits if you work while disabled).

The Plan defines when a participant becomes disabled, as when Prudential determines that:

> you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury;** and
>
> you have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.

WU0021 (emphasis in original).  The Plan defines "material and substantial duties" to be "duties that are normally required for the performance of your regular occupation, and cannot be reasonably omitted or modified," except that if the job regularly requires more than 40 hours per week, Prudential may consider a claimant still "able to perform that requirement" so long as the

5

claimant retains the capacity to work 40 hours per week, id.; in other words, the "material and substantial duties" of a job are still being performed even if a claimant, who previously worked more than 40 hours per week, can still perform those duties but limits his work to a regular full-time schedule of 40 hours per week.  This definition of disability has both an occupational component, the inability to continue performing the material and substantial duties of one's regular job, and an economic component, the loss of at least 20% of one's income.  A claimant is not disabled unless he satisfies both criteria.

After carefully reviewing the record, I conclude that the onset date for Urso's disability was April 1, 1999, making the relevant 3 month period of "average months Base Pay and Commissions" January – March 1999.  In April 1999, Urso was unable to perform the material and substantial duties of his regular occupation, and he sustained a 25% reduction in pay, rendering him disabled as defined by the Plan.  Several factors support this conclusion.

First, the undisputed evidence shows that Urso was diagnosed with thoracic outlet syndrome on July 2, 1998.  WU0111 (notes from Dr. William Patterson).  On September 10, 1998, Urso's

application for "Airman Medical Certificate" was denied, because he did not meet the prescribed medical standards. See WU0188[3]. As a result of his loss of certification, Urso was "grounded," which prevented him from continuing his work as a project-based software engineer and computer scientist on assignment with the Massachusetts Institute of Technology ("MIT"), which he had been doing for several years. See WU0187LD-LE; WU0187YE-YF. Because of his medical issues, Urso could no longer work in the confined spaces of bunkers and airplanes as he had done previously when at a project site, but was required to work in an office on restricted duty. See Pl.'s M. for Damages, Ex. 4 (explaining Urso was required to have the medical certification as a condition of his employment as a computer consultant in aviation systems); see also WU0187YF; WU0187YJ. Although Urso had not wanted his injuries to inhibit his ability to perform his job, see Pl.'s M. for Damages, Ex. 6 (Urso's January 1999 letter stating he was "not looking for a reduction in workload, or a change in responsibilities, or any extended time off"), he continued to suffer from physical ailments related to his computer work that required him to reduce his work load in April

---

[3] Urso had originally received the certification on October 4, 1996. See Pl.'s M. for Damages, Ex. 3.

1999 to only 6 hours per day.  <u>See</u> Pl.'s M. for Damages, Ex. 1 (doctor's "Authorization for Absence" to "avoid aggravation of his condition"); <u>see also</u> WU0187YK.  That reduced work day continued through the end of 1999 until he eventually had to stop work completely on January 18, 2000.

These facts demonstrate that Urso first became disabled when he reduced his work load to 6 hours per day in April 1999.  In late 1998 and early 1999, Urso already had been forced to stop performing the "material and substantial duties" that were normally required in his "regular occupation" as a computer software engineer on special projects with MIT, because the loss of his Airmen Medical Certification had prevented him from continuing in that capacity.  While the loss of an occupational license is not "in itself" proof of disability, <u>see</u> WU0021, the fact that the Plan specifically addresses such a loss indicates the significance of licensing in performing an occupation and suggests the loss is a factor to be considered in determining when a claimant becomes disabled.  It was not until April 1999, however, when Urso's work day was reduced by 25% from a standard 8 hour day to 6 hours per day, and his salary was proportionately reduced as well, that he satisfied the second component of the

Plan's definition of disability by having "a 20% or more loss in your indexed monthly earnings due to that sickness." See WU0021; see also WU0200-02 (printout of Urso's "Payroll Detail earnings" for 1999).

Second, the plain language of the Plan reflects a broad concept of "disability," to encompass both partial and total disability, as well as temporary and permanent disability. The definition itself contemplates partial disability, by requiring only a loss of 20% of income, not 100% of income, and an inability to perform the material and substantial duties of the claimant's regular occupation, not any occupation. See WU0021. The Plan anticipates that a disability also may not be permanent, by setting forth a separate provision for a disability that continues after 24 months. See id. A permanent disability occurs when "due to the same sickness. . . [the claimant is] unable to perform the duties of any gainful occupation," which in turn is defined as any occupation that the claimant is reasonably fitted to do, that would allow the claimant to earn "60% of his indexed monthly earnings" within a year of returning to work. Id. This definition of a permanent disability also has both a performance and an earnings component, and does not require a

complete loss of either.  By its explicit terms, the Plan expects and intends to provide benefits for various combinations of partial or total, and temporary or permanent, disabilities.

Accordingly, the critical "date of disability" for Urso is April 1, 1999, when he first became partially disabled and entitled to disability benefits under the Plan.  Though Urso did not become totally disabled until January 18, 2000, when his disability caused him to stop working completely, the onset date of his disability occurred in April 1999, when his work schedule and his income first were reduced by 25%.[4]  Because the Plan defines "monthly earnings" as the "average months Base Pay and Commission during the 3 month period **prior to your date of disability**," WU0023 (emphasis added), the relevant time period is January, February and March, 1999.[5]   This conclusion is

---

[4]Although the evidence showed Urso once had worked as many as 70 hours per week, the Plan does not consider a participant disabled if he cannot continue to work overtime, but instead looks to see if the participant can work a regular, 40 hour per week schedule.  See WU0021.

[5]Prudential's argument that Urso is entitled to only 60% of the salary he earned from Comsys in the latter part of 1999 when he was already partially disabled, which was only 75% of the income he earned before becoming disabled, does not comport with the plain language of the Plan or advance the policy goal of making ERISA participants whole.  See Varity Corp. v. Howe, 516 U.S. 489, 497 (1996) (explaining fiduciary role of ERISA to

supported both by the facts, as discussed above, and by the law. See Bath Iron Works Corp. v. Dir., U.S. Dep't of Labor, 193 F.3d 27, 32 (1st Cir. 2000) (enforcing terms of plan to allow date of onset of new injury to determine benefits calculation); cf. Davis v. First Union Corp. Long Term Disability Plan, 213 F. Supp. 2d 29, 37-38 (D. Mass. 2002) (denying LTD benefits because onset of disability occurred before claimant became eligible for coverage, even though claimant did not stop working or apply for benefits until after becoming eligible).

    The parties agree that Urso is entitled to receive LTD benefits at 60% of his average monthly earnings for the three months immediately preceding the onset of his disability.  They also agree that any benefits payment received under the Plan must be offset by sums Urso receives, or received, from worker's compensation and social security, and that Prudential actually overpaid Urso previously when it neglected to properly account for the worker's compensation and the social security disability income he received.  With the critical 3 month period of income

---

protect employee benefits); Firestone Tire & Rubber Co. v. Bruch, 489 U.S.  101, 108-114 (1989) (discussing ERISA's remedial scheme).

resolved, the monthly benefit determination follows.

Urso's LTD benefit payment calculations must be based on the average of his salary from January – March, 1999, which, based on the undisputed record before me, is $9,117.93.  See WU0200 (computer printout of Urso's payroll detail earnings).[6]  The Plan provides that 60% of the average monthly earnings, or $5,470.76, is the gross monthly benefit figure, from which any deductions required by the Plan must be taken, to calculate Urso's monthly payment for the period from April 17, 2000, when he first became entitled to receive LTD benefits, until January 30, 2008, the month in which Prudential's liability was determined.  Because I found that Urso is disabled within the meaning of the Plan, he also is entitled to continue to receive a monthly benefit payment as long as he remains disabled within the meaning of the Plan and abides by the provisions of the Plan governing the receipt of LTD benefits, including, in particular, any examinations by medical practitioners or vocational experts that Prudential may require

---

[6]The payroll detail appears to reflect Urso's biweekly paychecks without "bonuses, overtime pay, [or] any other extra compensation," WU0023; however, if those figures include sources of income that cannot be counted in monthly earnings as defined by the Plan, or otherwise do not accurately reflect Urso's income during the relevant time period, the parties are ordered to correct the record with appropriately verified documents.

as provided by the terms of the Plan.  <u>See</u> 29 U.S.C. § 1132(a)(1)(B) (allowing participant to recover benefits due him and enforce his rights under the terms of the Plan).  Plaintiff is ordered to recalculate the damage award based on this $9,117.93 gross monthly earnings figure, in the format submitted as Exhibit 1 to his motion.

        (b)  Prejudgment Interest

Urso also seeks interest on his damage award.  Prudential argues interest is not allowed as a matter of law, erroneously citing 28 U.S.C. § 1961(a), which governs post judgment interest awards.  "In ERISA cases, the district court has broad discretion both to determine whether to award prejudgment interest and to determine the parameters of such an award."  <u>Radford Trust v. First Unum Life Ins. Co.</u>, 491 F.3d 21, 24 (1st Cir. 2007).  In making this determination, the court balances several factors that weigh the equities of granting such an award.  <u>See</u> <u>id.</u> at 25 (deferring to district court to assess the equities); <u>see</u> <u>also</u> <u>Janeiro v. Urological Surgery Prof. Ass'n</u>, 457 F.3d 130, 138 (1st Cir. 2006) (following same analysis as award of attorney's fees to justify denial of prejudgment interest); <u>Caldwell v. Life Ins. Co. of N. Am.</u>, 287 F.3d 1276, 1286 (10th Cir. 2002) (evaluating

whether prejudgment interest would compensate the injured party without being inequitable).

I find, under the circumstances presented here, that prejudgment interest is justified. Urso has sought to obtain the LTD benefits to which he was entitled for many years, through two rounds of litigation in this court and several reviews by the Plan administrator. During this process his mental and physical health have deteriorated, and his socioeconomic status has eroded substantially. The cost of prejudgment interest would be relatively insignificant to Prudential but would contribute significantly towards compensating Urso for the damages he has sustained. Urso is entitled to prejudgment interest at the federal rate, which figure shall be calculated after the final damage award is determined. See Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 224-25 (1st Cir. 1996) (explaining remedies for federal statutory claims ordinarily are governed by federal law); see also Cook v. Liberty Life Ass. Co. of Boston, No. Civ. 00-408-B, 2002 WL 482572, *4 (D.N.H. March 29, 2002), aff'd 320 F.3d 11 (1st Cir. 2003). Interest ordinarily accrues from the date a claimant is first denied benefits, see Cottrill, 100 F.3d at 224, which occurred here on April 17, 2002. See

WU0108B.  Urso appealed that initial denial of LTD benefits, however, and succeeded in getting LTD benefits reinstated through September 16, 2003.  See WU0108F.  Accordingly, interest began to accrue on September 17, 2003.  See id. at 224 (allowing interest from the date the fiduciary withholds money legally due serves ERISA's remedial purpose of making a participant whole).

Finally, in his motion for damages, Urso seeks to include the costs incurred in obtaining the relief sought.  Because the costs include costs associated with Urso's first action to recover the benefits due, see Urso v. Prudential Ins. Co. of Am., No. 03-cv-24-JD (D.N.H.) ("Urso I"), and because an award of costs is governed by the same statutory provision governing an award of attorney's fees, I will address his right to costs below in my analysis of Urso's request for attorney's fees.

### 2.  Motion for Attorney's Fees (document no. 27)

A prevailing party in ERISA cases may seek reasonable attorney's fees and costs.  See 29 U.S.C. § 1132(g)(1).  There is no presumption in favor of such an award, but "instead fee awards under ERISA are wholly discretionary." Cottrill, 100 F.3d at 225.  In Cottrill, the First Circuit announced its standard which district courts are to follow to determine the appropriateness of

awarding fees.  See id.; see also Janeiro, 457 F.3d at 143 (following Cottrill).  The five factors that should be considered are:  "(1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions." Cottrill, 100 F.3d at 225.  This list provides a guide to the district court and "is illustrative, not exhaustive," with no need for every factor to be considered in every case or any single factor to be dispositive.  Id.

Guided by these considerations, I find an award of attorney's fees to be equitable in this case.  While I do not necessarily believe that Prudential acted in bad faith here, I find it did not assess Urso's condition with the degree of care and attention to detail that was warranted.  With respect to the second factor, an award of attorney's fees would not deplete the assets of the Plan, which is insured by Prudential, to the detriment of the remaining participants.  Cf. Janeiro, 457 F.3d

at 144 (benefits award already depleted the Plan's assets substantially).  The third and fourth factors work in tandem here, where my reading of the Plan's definition of disability would serve to benefit those participants who become partially disabled but continue to work and who should not be penalized for their efforts to try to remain employed.  Given my analysis of Urso's claim, I clearly find that the merits of his position outweighed the merits of Prudential's position here.  The factors to be considered point to an award of attorney's fees, which shall be granted here.

   One final matter must be addressed.  Urso commenced this litigation on January 23, 2003, when he filed Urso I.  That case was closed after it was remanded back to the Plan administrator for a full and fair hearing.  See Urso I, slip op. at 12-13 (D.N.H., Nov. 23, 2004).  Following exhaustion of his administrative remedies on remand, Urso commenced the instant suit.  This action was an appeal from the Plan administrator's final decision, issued July 1, 2005.  The procedural history and factual record both demonstrate that Urso has pursued one long litigation effort to obtain the LTD benefits due him under the Plan.  I find that Urso I was part and parcel of the instant suit

and, therefore, conclude that it is equitable to include the costs and attorney's fees incurred in Urso I with the award of attorney's fees and costs granted here.

## Conclusion

For the reasons set forth above, Urso's Motion for Damages, Interests and Costs (document no. 22) and his Motion for Attorney's Fees (document no. 27) are granted.

Urso is ordered to file with the court a revised Exhibit 1 to his Motion for Damages, to set forth his damages calculation based on the monthly salary figure determined above, within two weeks of the date of this order.  Prudential shall respond to Urso's new damage award total within ten days of the receipt of the revised calculation.

Urso is entitled to an award of attorney's fees in the amount of $76,998.50, as set forth in the detailed statement of services rendered attached as Exhibit 2 to his Motion for Attorney's Fees.  He is also entitled to the costs incurred in bringing this suit; however, it appears that the costs set forth in Exhibit 1 attached to his Motion for Damages, which totaled $4,469.66, have been included in the expenses detailed in Exhibit 2 to his Motion for Attorney's Fees, which totaled $10,708.53.

Accordingly, Urso shall be awarded his attorney's fees of $76,998.50, plus costs in the amount of $10,708.53, for a sum total of $87,707.03.

    **SO ORDERED.**

```
                      _____
                      James R. Muirhead
                      United States Magistrate Judge
```

Date:  April 24, 2008

cc:   Robert A. Shaines, Esq.
      William T. Bogaert, Esq.
      Christopher P. Flanagan, Esq.